#27368-a-JMK
**2017 S.D. 79**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

MARK AND MARILYN LONG,
ARNIE AND SHIRLEY VAN VOORST,
TIM AND SARA DOYLE,
TIMOTHY AND JANE GRIFFITH
AND MICHAEL and KAREN TAYLOR,            Plaintiffs and Appellees,

v.

STATE OF SOUTH DAKOTA,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE PATRICIA C. RIEPEL
Retired Judge

* * * *

MARK V. MEIERHENRY
CHRISTOPHER HEALY
CLINT SARGENT of
Meierhenry Sargent, LLP
Sioux Falls, South Dakota          Attorneys for plaintiffs
                                 and appellees.

GARY P. THIMSEN
JOEL E. ENGEL III of
Woods, Fuller, Shultz & Smith, PC
Sioux Falls, South Dakota          Attorneys for defendant
                                 and appellant.

* * * *

ARGUED ON
JANUARY 12, 2016

OPINION FILED **11/21/17**

#27368

KERN, Justice

[¶1.]	Landowners filed an inverse condemnation claim against the State of South Dakota (State) and the City of Sioux Falls (City) seeking damages and a permanent injunction due to flooding on Landowners' properties. The circuit court bifurcated the issue of whether a constitutional damaging of property had occurred from the question of damages. Prior to the court trial on liability, Landowners and the City settled. The court granted the State's request to file a cross-claim against the City seeking indemnification and contribution. At the conclusion of the court trial, the court issued a judgment for Landowners. The court dismissed the cross-claim finding the State failed to prove that the City was liable. The question of damages was presented to a jury. After a four-day trial, the jury found the flood permanently damaged Landowners' properties and awarded individual damages to each of the Landowners. The State appeals. We affirm.

## BACKGROUND

[¶2.]	Minnehaha and Lincoln Counties are drained by a natural watercourse referred to as the Spring Creek Tributary Drainage Basin. In 1949, the South Dakota Department of Transportation (DOT) built Highway 11. The Highway runs north and south through Lincoln and Minnehaha Counties and across the natural waterway known as Spring Creek. The State maintains sole control over Highway 11. At the time of construction, the DOT installed various culverts, including two 48-inch culverts and one 24-inch culvert, to permit the Spring Creek Tributary, which flows in a southeastern direction, to flow under Highway 11 into Spring Creek.

-1-

#27368

[¶3.] All of the Landowners' properties are located on the west side of Highway 11, north of the intersection of Highway 11 and 85th Street, in an area referred to as the Village of Shindler or Elmen Acres. The homes lie in a sub-basin within the Spring Creek Tributary Basin. They are separated from the greater basin by the natural lay of the land and a ditch block (driveway) south of the twin 48-inch culverts. The single 24-inch culvert drains surface water from the sub-basin. The 24-inch culvert is too small to drain water entering the sub-basin from outside sources.

[¶4.] In 2009, the DOT began planning a project to resurface a portion of Highway 11 near Landowners' properties. Due to area residents' complaints that the culverts were inadequate to effectively drain the Spring Creek Tributary, State engineers conducted a study of the twin 48-inch culverts. The engineers released their findings in the fall of 2009 in a Hydraulic Data Sheet. In making their determinations regarding the capacity of the culverts, the engineers utilized data contained within the 2008 Federal Emergency Management Agency (FEMA) Report Flood Plain Map. The FEMA Report included run-off data from the City. Based on their calculations, the engineers concluded that when water reached the flow rate of 275 cubic feet per second (cfs) or greater, water would pond behind the culverts to such an extent that it would pour over the ditch block to the south and into the sub-basin.

[¶5.] The engineers determined that statistically a flow of 275 cfs would occur in an eight-year-rain event. In other words, it was likely to occur once every eight years with a 12.5% chance of occurrence in any given year. The Hydraulic

Data Sheet provided that a 100-year-rain event would involve water flowing towards the culverts at 803 cfs. A 100-year-rain event would have a 1% likelihood of occurring each year. The hydraulic standard is to keep the 100-year-flood elevation below the top of Highway 11. The Hydraulic Data Sheet concluded that if water flowed over the ditch block, it would flood into the sub-basin containing Landowners' properties. Once water entered the sub-basin, it could drain only through the 24-inch culvert designed to handle a flow of 40 cfs.

[¶6.] Upon completion of the study, the State proceeded in 2010 with its resurfacing project on a portion of Highway 11 near Landowners' properties. During the resurfacing, leaking joints in the two original 48-inch culverts were repaired. The original culverts were then reset in the same general location, but slightly lower. No other alterations were made.

[¶7.] On July 29 and 30, 2010, just a few months after the project's completion, a significant amount of rain fell in the Spring Creek Tributary Basin causing flooding, which damaged Landowners' real and personal properties. An official rainfall measurement for the basin is unavailable. The National Weather Service (NWS) at the Sioux Falls airport, however, measured a total of 0.72 inches received on July 29. On July 30, a total of 2.23 inches of rain fell, which is considered a ten-year-rain event. The heaviest rainfall occurred during the early morning of July 30, when 1.9 inches fell over a two-hour period, which is considered

a five-year-rain event. Prior to these events, Landowners had not experienced surface flooding.[1]

[¶8.] In November 2010, Landowners filed a complaint and later an amended complaint for damages and a permanent injunction. They asserted claims of negligence, trespass, and inverse condemnation against the State and the City. The State responded by filing an answer and a motion to dismiss. The State also filed a motion for summary judgment arguing the doctrine of sovereign immunity barred the Landowners' claims. The State alleged it was immune because Landowners' claims arose out of the design and engineering of a South Dakota public roadway. The circuit court denied both of the State's motions.

[¶9.] Prior to trial and upon consideration of this Court's decision in *Rupert v. City of Rapid City*, Landowners filed a second amended complaint dismissing their tort claims of negligence and trespass. 2013 S.D. 13, 827 N.W.2d 55. Instead, Landowners elected to proceed only on their inverse condemnation claim directly under Article VI, § 13 of the South Dakota Constitution for damage to their property. Thereafter, Landowners and the City reached a confidential settlement. The State sought permission to bring a cross-claim against the City seeking contribution and indemnity based upon a determination of relative degrees of fault. The circuit court permitted the filing of the cross-claim over Landowners' objection.

[¶10.] The issue of liability was tried before the circuit court on February 18–20, 2014. During trial, Landowners testified and presented expert testimony from

---

1. Some Landowners had experienced prior flooding in their homes due to sump pump issues.

Arthur Umland, former lead forecaster for the NWS; Kevin Goeden, program manager for the office of bridge design for the DOT; Jon Peters, floodplain administrator and Geographic Information System administrator for Lincoln County; Mark Mainelli, civil engineer; and Kevin Goff, licensed professional engineer at Clark Engineering & Consulting. The State presented expert testimony from Bruce Crumb, lead highway maintenance worker for the DOT; Chad Hanisch, professional engineer at Infrastructure Design Group; Donald Harmon, former chief meteorologist in charge of the NWS; and Dr. Dennis Todey, associate professor at South Dakota State University and State Climatologist.

[¶11.] At the conclusion of the trial, the circuit court entered findings of fact, conclusions of law, and a judgment of liability; finding the State responsible for the flooding of Landowners' properties. The court's judgment provided, "The State acquires no estate or property interest in the land of [Landowners]."

[¶12.] On the question of liability, the circuit court found that the culverts were "of insufficient size to handle the drainage needs of Spring Creek Tributary." And but for the construction of Highway 11 on a berm, the "natural drainage of the Spring Creek Tributary [B]asin . . . would not have caused any damage to" Landowners' properties. Specifically, the court found that the two 48-inch culverts were equipped to handle an eight-year-rain event. An eight-year-rain event would cause "water [to] back up behind the culverts to such a degree that it would overtop the ditch block" near the culverts and crest over Julie Drive. If Julie Drive was overtopped, water flowed directly into the sub-basin containing Landowners' properties. The sub-basin was drained only by a single 24-inch culvert, which the

court found inadequate to drain the closed basin caused by the construction of Highway 11. Based upon the evidence presented, the circuit court found that the "State knew or should have known that an eight-year event and above would cause flooding to [Landowners' properties] as a result of the Highway 11 blockage of the natural drainage." The court further found that the design pushed water into the closed sub-basin to avoid overtopping and damaging Highway 11. Based on the available data, the State decided to pool water behind Highway 11 to slow the flow of water to downstream locations.

[¶13.]       At the conclusion of the court trial, the court dismissed with prejudice the State's cross-claim for indemnity and contribution. The court found that the State failed to prove its claim that the urban development on the south side of Sioux Falls caused the extra run-off and contributed to the flood. The State failed to present any evidence quantifying the amount of water caused by the urbanization. The court determined that the State had "no legal or equitable right to indemnity from the City."

[¶14.]       A jury trial was held on Landowners' request for damages from December 15–18, 2014. The jury determined the flood waters caused permanent damage to the Landowners' real and personal properties and calculated damages individually for each of the Landowners. Final judgments were prepared and entered in January 2015 by the circuit court.

[¶15.]       The State appeals and we restate the issues as follows:

> 1.     Whether Landowners' claims were barred by sovereign immunity.
>
> 2.     Whether the State's construction of South Dakota Highway 11 and accompanying culverts caused the

> damage to Landowners' properties in violation of the
> South Dakota Constitution, article VI, § 13.

3.   Whether the State is entitled to seek contribution or indemnification against the City due to Landowners' settlement with the City.

4.   Whether the State has a drainage easement over Landowners' real estate.

## ANALYSIS

### 1.   *Whether Landowners' claims were barred by sovereign immunity.*

[¶16.]   The State maintains that the circuit court should have dismissed Landowners' Article VI, § 13 claims based upon the doctrine of sovereign immunity. The State argues that sovereign immunity applies because Landowners' claims involved the design, construction, and maintenance of public highways.[2]  The State also contends that sovereign immunity applies because the "decisions regarding the placement, engineering, and design of Highway 11, along with decisions regarding . . . [the] culverts, were discretionary acts[.]"  Whether a plaintiff's claim is precluded by sovereign immunity is a question of law reviewed de novo.  *Truman v. Griese*, 2009 S.D. 8, ¶ 10, 762 N.W.2d 75, 78.

[¶17.]   In *Truman*, we stated that "[s]overeign immunity is the right of public entities to be free from liability for *tort claims* unless waived by legislative

---

2.   Specifically, the State asserts that sovereign immunity has only been waived to the extent such damages are covered under the State's risk-sharing pool. *See* SDCL 21-32A-2 (granting sovereign immunity except where the State participates in a risk-sharing pool or insurance).  The State submits that its risk-sharing pool excludes "*torts* arising from . . . the engineering or design of any public roadway or pub[l]ic transportation project." (Emphasis added.)  For a thorough discussion of sovereign immunity for tort and the State's risk-sharing pool see *Kyllo v. Panzer*, 535 N.W.2d 896, 898-900 (S.D. 1995).

enactment." *Id.* ¶ 9 (emphasis added). Landowners in the present case dismissed their tort claims, leaving only the inverse condemnation claims. Because there were not any tort claims pending, the State cannot raise the affirmative defense of sovereign immunity. Indeed, we held in *Rupert* that Article VI, § 13 of the South Dakota Constitution "essentially abrogates sovereign immunity." 2013 S.D. 13, ¶ 43, 827 N.W.2d at 71. "The abrogation of a governmental entity's sovereign immunity in cases involving a taking or damaging of private property is so fundamental that it is not found in statute, but rather in our Bill of Rights in the Constitution." *Id.* As we noted in *Hurley v. State*, "[n]either consent to sue the state nor the creation of a remedy by legislative enactment is necessary to obtain relief for a violation of the [Constitution]." 82 S.D. 156, 169, 143 N.W.2d 722, 729 (1966). Accordingly, the State is not shielded by sovereign immunity from Landowners' inverse condemnation claims.

[¶18.] Citing *Hannaher v. St. Paul, Minneapolis & Manitoba Railway Co.*, 5 Dakota 1, 37 N.W. 717 (1888), the dissent concludes that Landowners' inverse condemnation claim was actually a tort for which they cannot be compensated. In *Hannaher*, plaintiff filed a tort claim against the railroad alleging that the construction of an embankment, ditches, and culverts, necessary to construct the railroad track, cast flood waters upon plaintiff's lands and crops. 37 N.W. at 717-18. Notably, plaintiff did not plead a taking.[3] *See id.* The Court questioned whether

---

3. The decision in *Hannaher* predates the inclusion of the Damage Clause to Article VI, § 13. The Damage Clause was not adopted until the Constitutional Convention of 1889. *See Benson v. State*, 2006 S.D. 8, ¶ 41 n.4, 710 N.W.2d 131, 146 n.4.

plaintiff could maintain the negligent construction claim as pleaded, "although defendant had a right to do what it did, and although the act complained of was done in the usual and ordinary manner, with the usual and ordinary care and skill[.]" *Id.* at 720. Ultimately, the Court determined that when the railroad condemned plaintiff's property to construct the track, "the compensation made [wa]s understood to cover all the damages naturally arising, and reasonably expected to flow, from the proper construction and maintenance of the [railroad]." *Id.* at 721.

[¶19.] The present case is distinguishable because there is not any evidence in the record that Landowners, nor their predecessors in interest, were compensated for the condemnation of property used to construct Highway 11. The record is completely devoid of the circumstances under which the State acquired the land to construct Highway 11.[4] Further, the State did not claim below, nor does it

---

4. The dissent is premised on the erroneous assumption that the taking and damaging to Landowners' properties occurred in 1949—when Highway 11 was constructed. However, there is no evidence in the record as to what was allegedly taken, who owned the land at the time of the alleged taking, and whether the alleged taking overlapped with the rights of the Landowners herein. There is no evidence in the record that a taking even occurred in 1949.

   The present case is also distinguishable from *Johns v. Black Hills Power, Inc.*, 2006 S.D. 85, 722 N.W.2d 554. In that case, Johns brought a claim for inverse condemnation against Black Hills Power alleging that an anchor pole and guy wires placed on the property before they had purchased the property constituted a permanent taking. *Id.* ¶ 9, 722 N.W.2d at 557. The Court determined that any cause of action for inverse condemnation belonged to the prior owners and that the Johns lacked standing to maintain the action. *Id.* ¶ 12, 722 N.W.2d at 558. The reasoning of the Court was that the anchor pole and guy wires were obvious to the Johns when they purchased the property and that "any diminution in value caused by the placement of the pole and wires presumably was reflected in the purchase price." *Id.* The same is not true in this case. There was not any evidence in the record that

(continued . . .)

#27368

claim now, that the flooding in 2010 was within the scope of the right previously acquired by the State to construct the highway. *See infra* ¶ 69. It is incumbent on the appellant, in this case the State, to present an adequate record on appeal.

---

(. . . continued)

the potential for flooding was obvious to Landowners and that diminution for such a risk was reflected in their purchase price.

Further, this case is distinguishable from *Palazzo v. Rhode Island*, 533 U.S. 606, 121 S. Ct. 2448, 150 L. Ed. 2d 592 (2001). *Palazzo* involved a regulatory taking claim against the State of Rhode Island after it designated Landowner's land "protected coastal wetlands." *Id.* at 614-15, 121 S. Ct. 2455-56. Landowner sued for inverse condemnation, alleging that certain wetlands regulations deprived him of all economically beneficial use of his property. *Id.* at 615, 121 S. Ct. 2456. The State claimed that Landowner could not maintain his claim because when title of the land was transferred from the corporation, in which Landowner was the sole shareholder, to Landowner as an individual, the wetlands regulations were already in effect. *Id.* at 626, 121 S. Ct. at 2462. The Court rejected the argument, providing that "[f]uture generations, too, have a right to challenge unreasonable limitations on the use and value of land." *Id.* at 627, 121 S. Ct. at 2448. The present case did not involve a regulatory taking. And while it is a correct statement of the law that "any award goes to the owner at the time of the taking, and that the right to compensation is not passed to a subsequent purchaser[,]" *see infra* ¶ 69, quoting *Palazzo*, such a statement is inapplicable here where there is no evidence of a taking in 1949.

Instead, this case is more similar to *Smith v. Charles Mix County*, 85 S.D. 343, 182 N.W.2d 223 (1970). In *Smith*, Landowner brought an inverse condemnation claim against the County alleging that the placement of two culverts in a highway abutting Landowner's cropland diverted flood waters onto his fields. *Id.* at 345, 182 N.W.2d at 224. The County acquired the highway from the Department of the Interior in 1957 and subsequently made improvements. *Id.* at 345, 182 N.W.2d at 223-24. The flooding to Landowner's field did not occur until 1967—ten years after the County acquired the highway. *Id.* at 345, 182 N.W.2d at 224. The Court concluded that the County's actions constituted "a compensable taking or damaging [of] private property for a public use . . . ." *Id.* at 346. Notably absent from the Court's analysis was an insistence that the County acquired the right to flood Landowner's fields when it acquired the highway from the Department of Interior in 1957, or that the taking actually occurred in 1957 and either Landowner or his predecessor was already compensated for such an occurrence.

-10-

*Klutman v. Sioux Falls Storm*, 2009 S.D. 55, ¶ 36, 769 N.W.2d 440, 453. And the Court "has said on countless occasions that an issue may not be raised for the first time on appeal." *Mortweet v. Eliason*, 335 N.W.2d 812, 813 (S.D. 1983).

[¶20.]     This Court provided in *Rupert* that when a condemnor validly exercises its authority, the condemnor's "actions cannot be deemed 'tortious' or in violation of any 'duty' that is necessary to support a tort." 2013 S.D. 13, ¶ 44, 827 N.W.2d at 71. As a result, we held that even though the Ruperts pleaded claims for tort and a taking, the Ruperts' recovery was limited to "'just compensation' pursuant to Article VI, § 13, of the South Dakota Constitution." *Id.* Likewise in this case, the State validly exercised its authority in constructing, reconstructing, and maintaining Highway 11 from the time of construction through the time of the flood. Consequently, a theory of tort could not be supported. Landowners properly dismissed their tort claim and their recovery was limited to just compensation.

> **2.     Whether the State's construction of Highway 11 and accompanying culverts caused the damage to Landowners' properties in violation of the South Dakota Constitution article VI, § 13.**

[¶21.]     The State challenges the circuit court's determination that its actions caused water to invade Landowners' properties. Asserting that a number of the circuit court's findings of fact were clearly erroneous, the State submits that the court failed to correctly analyze the technical data presented by the State's experts. The State also argues that numerous supervening causes unrelated to the State's conduct led to the flood. Further, the State contends that Landowners must prove that the State engaged in direct and substantial action or abuse to prevail.

[¶22.]     In addition to this causation argument, the State contends that

Landowners failed to satisfy the requirements of the consequential damages rule as

set forth in *Krier v. Dell Rapids Township*, 2006 S.D. 10, 709 N.W.2d 841.  Under

our holding in *Krier*, Landowners must establish that the injury to their property

was peculiar in nature and not of the kind suffered by the public as a whole.  2006

S.D. 10, ¶ 26, 709 N.W.2d at 847-48.

> ### a. Did the construction of Highway 11 cause water to invade Landowners' properties?

[¶23.]     The State alleges that the duty to show both actual and proximate

causation is implicit in inverse condemnation.  We agree.[5]  However, the State

further argues that "the evidence adduced at trial did not establish that the State's

construction of Highway 11, along with accompanying culverts, was the proximate,

*substantial, or immediate cause* of the flood that damaged the [Landowners']

properties." (Emphasis added.)  In response, Landowners contend that the State's

attempt to expand the requirements of proximate cause by adding the terms

*substantial and immediate* is contrary to our most recent pronouncement in *Rupert*.

In *Rupert*, we affirmed the circuit court's determination that the landowners must

establish that the government's action was the legal cause of the invasion which led

---

5.     Several jurisdictions apply the common law tort principle of causation to inverse condemnation claims.  *See, e.g., Bakke v. State*, 744 P.2d 655, 657 (Alaska 1987); *Belair v. Riverside Cty. Flood Control Dist.*, 764 P.2d 1070, 1074-76 (Cal. 1988) (holding that "there must be a showing of 'a substantial cause-and-effect relationship excluding the probability that other forces alone produced the injury.'"); *Thelen v. City of Billings*, 776 P.2d 520, 522-25 (Mont. 1989); *Henderson v. City of Columbus*, 811 N.W.2d 699, 713-19 (Neb. Ct. App. 2012), *rev'd on other grounds*, 827 N.W.2d 486 (Neb. 2013); *Aasmundstad v. State*, 763 N.W.2d 748, 755-59 (N.D. 2008); *Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532, 539 (Tex. 2013).

to the damage. *See* 2013 S.D. 13, ¶ 17, 827 N.W.2d at 63. Our jurisprudence defines proximate or legal cause. We find no reason to depart from this definition for cases of inverse condemnation, nor have we done so in prior cases. Proximate cause or legal cause "is defined as 'a cause that produces a result in a natural and probable sequence and without which the result would not have occurred. Such cause need not be the only cause of a result. It may act in combination with other causes to produce a result.'" *Peterson v. Issenhuth*, 2014 S.D. 1, ¶ 17, 842 N.W.2d 351, 355-56 (quoting *Estate of Gaspar v. Vogt, Brown & Merry*, 2003 S.D. 126, ¶ 6, 670 N.W.2d 918, 921). As we noted in *Rupert*, there is "no magic formula that enables a court to judge, in every case, whether a given government interference with property is a taking." 2013 S.D. 13, ¶ 10, 827 N.W.2d at 61 (quoting *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31, 133 S. Ct. 511, 518, 184 L. Ed. 2d 417 (2012)). "Instead, the viability of a takings claim . . . depend[s] upon situation-specific factual inquiries." *Id.*

[¶24.] At trial, Landowners presented expert testimony on the issue of causation through engineer Mark Mainelli, whom the circuit court found to be credible. Mainelli created a model of the drainage as it existed on July 29–30, 2010, and of the basin before the construction of Highway 11 using a software package commonly used by the Army Corps of Engineers for hydraulic studies and FEMA data. Mainelli concluded that without the Highway 11 blockage, the water would not have gone over the ditch block south of the 48-inch culverts, down the west ditch of Highway 11, causing damage to Landowners' properties. Mainelli also created a strip map showing the elevations of the driveways and culverts within the sub-

basin containing Landowners' properties. Mainelli explained to the jury that once the water overwhelmed the twin 48-inch culverts, it topped the ditch block to the south and then ran over each of the subsequent ditch blocks as they were all of slightly lower elevation. The single 24-inch culvert in the sub-basin was inadequate to handle this flow.

[¶25.]	Landowners also called the State's chief bridge engineer, Kevin Goeden, who testified about the hydraulic study conducted prior to the resurfacing project. He indicated that the study determined that water would overtop the ditch block to the south of the culverts at 275 cfs, which was an eight-year-rain event.[6] The court found that Goeden admitted that the "cause of the flood was water held back by the State's improvements known as Highway 11." Based on the testimony of these two witnesses, the court found that blockage of the natural flow of the Spring Creek watershed by the construction of Highway 11 was a legal cause of the flooding and damaging of Landowners' properties. The State's drainage plan for the watershed was insufficient to drain the natural watercourses. The State's design pushed water into the closed basin to avoid overtopping Highway 11 causing Landowners' damages.

[¶26.]	The dissent concludes that Landowners failed to establish that their losses were foreseeable. "[F]or proximate cause to exist, the harm suffered must be found to be a foreseeable consequence of the act complained of." *Hamilton v. Sommers*, 2014 S.D. 76, ¶ 39, 855 N.W.2d 855, 867. "This does not mean, of course, that the precise events which occurred could, themselves, have been foreseen as

---

6.	Flows of 803 cfs would constitute a 100-year-rain event.

they actually occurred; only that the events were within the scope of the foreseeable risk." *Musch v. H-D Co-op., Inc.*, 487 N.W.2d 623, 625 (S.D. 1992).

[¶27.]    The dissent begins with the proposition that "Landowners had the burden of proving their losses were foreseeable (i.e., probable) at the time the State constructed Highway 11."[7] *Infra* ¶ 63. However, the dissent misapprehends how this Court views foreseeability as it relates to duty and causation. Our Court has recognized that "foreseeability for purposes of establishing a duty is not invariably the same as the foreseeability relevant to causation." *Poelstra v. Basin Elec. Power Co-op.*, 1996 S.D. 36, ¶ 18, 545 N.W.2d 823, 827. "The latter essentially is to be viewed as of the time when the damage was done while the former relates to the time when the act or omission occurred." *Id.* Thus, Landowners are not required to prove that their losses were foreseeable when the State constructed Highway 11 in 1949, i.e., when the act occurred. Rather, to determine foreseeability as it relates to causation, we must look to when the damage was done. The standard is whether

---

7.    The dissent is premised on the unsupported notion that a taking in this case occurred in 1949 when the State constructed Highway 11. *See supra* ¶¶ 18-19. Here the dissent builds on its point by concluding that Landowners' damages must have been foreseeable at the time of the taking in 1949. However, Landowners alleged in their complaint that the damaging to their properties occurred in 2010. The State did not dispute the temporal aspect of Landowners' complaint. And, because it was undisputed, the court did not make any findings of fact or conclusions of law on this issue. Again, we decline to address the issue raised by the dissent when the issue was not raised or briefed by the parties and the trial court was not given an opportunity to rule on the issue. *See supra* ¶ 19.

the damage "ought to have been foreseen in the light of the attending circumstances."[8]  *Musch*, 487 N.W.2d at 625.

[¶28.]    The circuit court appropriately considered all of the attending circumstances from the time the flooding occurred back to the time the State constructed Highway 11.  Specifically, the court found that the State constructed Highway 11 across the natural watercourse of the Spring Creek Tributary; that the State installed two 48-inch culverts and one 24-inch culvert to accommodate drainage of the basin; that, during a 2010 resurfacing project of Highway 11, an analysis of the culverts showed that flooding would occur during an eight-year-rain

---

8.    The dissent cites 4A Julius L. Sackman, *Nichols on Eminent Domain* § 14.03[2][c][iv] (3d ed., rel. 124-11/2016) for the principle that "[d]amages that are too remote to have been foreseeable *at the time of the taking . . .* are not consequences of the taking and are generally not recoverable as just compensation."  (Emphasis added.)  But here the date, occurrence, and circumstances of any taking in 1949 are unknown.  The damaging in this case occurred after Landowners' properties were flooded in 2010.  The residents of Elmen Acres complained that the culverts were inadequate to effectively drain the Spring Creek Tributary before the flooding event.  These complaints prompted a drainage study in 2009.  The Hydraulic Data Sheet from the study indicated that during an eight-year-rain event, water would pond behind the culverts to such an extent that it would pour over the ditch block to the south and into the sub-basin.  These are relevant factors to consider in determining whether the damage to Landowners' property was foreseeable.

The dissent also cites to *Hyde v. Minn., Dak. & Pac. Ry. Co.*, 29 S.D. 220, 231, 136 N.W. 92, 96 (1912), for the notion that "damages to be recompensed for under the law of eminent domain are . . . only such as could be anticipated by a jury in the trial of an action brought before the 'damage' had taken place."  This is simply a prohibition against speculative damages in an eminent domain proceeding.  *See, e.g., State v. Richey Motor Co.*, 270 N.W.2d 48, 51 (S.D. 1978) ("Respondent is entitled to just compensation based upon the actual situation, not to speculative compensation based upon a hypothetical situation.").  The dissent does not point to any specific damages awarded to Landowners that were speculative.

event; that the culverts were of insufficient size to handle the drainage needs of the Spring Creek Tributary; and that, based on the foregoing "the State knew or should have known that an eight year rain event and above would cause flooding to [Landowners] property as a result of the Highway 11 blockage of the natural drainage." Although the court did not use the precise terms of "foreseeability" or "natural and probable sequence," the court's findings are sufficient to sustain a finding of foreseeability for the purpose of proximate cause.

[¶29.]     The State challenges these and several other findings, which served as the basis for the circuit court's determination of liability, as erroneous. In total, the court entered 72 findings of fact. It is well-established "that the credibility of witnesses and weight of evidence is for the trial court and that a reviewing court accepts that version of the evidence, including the inferences that can be fairly drawn therefrom, which is favorable to the trial court's determination." *In re Estate of Dokken*, 2000 S.D. 9, ¶ 25, 604 N.W.2d 487, 494. We review a circuit court's findings of fact for clear error. *Schieffer v. Schieffer*, 2013 S.D. 11, ¶ 15, 826 N.W.2d 627, 633, *reh'g denied* (Mar. 12, 2013). Accordingly, a finding of fact will be overturned on appeal, only if "a complete review of the evidence leaves this Court with a definite and firm conviction that a mistake has been made." *Id.*

[¶30.]     The State specifically attacks the circuit court's findings of fact 40 and 41, in which the court discounted the testimony of Dr. Todey. As the State Climatologist, Dr. Todey tracks and measures precipitation in South Dakota. He also coordinates a network of volunteers who measure precipitation once per day and record the results online. The network is referred to as the Community

Collaborative Rain, Hail, and Snow Network ("CoCORaHS"). Prior to trial, Landowners filed a motion to prohibit Dr. Todey from testifying and presenting CoCORaHS data. Landowners claimed the data was inaccurate as it did not include the time and amount of the precipitation necessary to determine intensity and compute flow rates. Although the circuit court permitted Dr. Todey's testimony, the court ultimately rejected it. Instead, the court found credible the rainfall data of Landowners' expert Art Umland, a former meteorologist for the NWS for 30 years. In forming his opinions, Umland relied on hourly measurements taken at the NWS station in Sioux Falls along with other statistical data. Umland determined that the total rainfall on July 30 was 2.23 inches, which was a ten-year-rain event. Of that total, 1.9 inches fell in a two-hour time frame, which Umland classified as a five-year-rain event. The court weighed the credibility of the expert witnesses and the reliability of their findings. This is uniquely the function of the circuit court. From our review of the record we are not persuaded that the circuit court's credibility determinations or findings on causation were clearly erroneous.

[¶31.] The State, citing *Smith v. Charles Mix County*, next argues that intentional government conduct is necessary to prove the element of causation. 85 S.D. 343, 182 N.W.2d 223. In *Smith*, we affirmed the judgment finding the county liable for intentionally draining water onto farmland in order to protect a county highway. *Id.* at 345-46, 182 N.W.2d at 224. In forming this conclusion, we referred to *Bruha v. Bochek*, where we stated,

> [T]he owner of the dominant land, in the exercise of a reasonable use of his property, has the right by means of ditches and drains on his property to accelerate the flow of surface waters into a natural watercourse, and into which such waters naturally

> drain, provided he does not permit an accumulation of water on his property and cast the same on the servient land in unusual or unnatural quantities.

76 S.D. 131, 133, 74 N.W.2d 313, 314 (1955). These principles, we held, applied to a county's "construction, improvement, and maintenance of its highways." *Smith*, 85 S.D. at 346, 182 N.W.2d at 224. "[A] county cannot divert surface waters into unnatural watercourses or gather water together in unnatural quantities and then cast it upon lower lands in greater volume and in a more concentrated flow than natural conditions would ordinarily permit." *Id.* Damages caused by such an act "constitute a compensable taking or damaging of private property for public use under Section 13, Article VI, S.D. Constitution." *Id.*

[¶32.] The State argues that causation in this case has not been established as there is no evidence of intentional conduct. While intentional conduct occurred in *Smith,* we did not hold that it was a necessary element for an inverse condemnation claim. We addressed this issue in *Rupert*. The City of Rapid City, relying on *City of Brookings v. Mills*, 412 N.W.2d 497, 501 (S.D. 1987), argued that the Ruperts were required to prove that the damage to their property was the result of a "direct and substantial action or abuse" by Rapid City. *Rupert*, 2013 S.D. 13, ¶ 11, 827 N.W.2d at 61-62. In rejecting this argument, we found that the requirement to show "proof of a 'direct and substantial action by the government' in inverse condemnation cases was limited to causes of action for a 'de facto taking' where the governmental entity delayed condemning the property" and Landowners were injured by the delay. *Rupert*, 2013 S.D. 13, ¶ 14, 827 N.W.2d at 62. As Landowners

herein are not alleging a de facto taking, they are not obligated to prove the intentional conduct involved a direct and substantial action or abuse.

[¶33.]     The circuit court found that the State's liability herein arose from the construction of the Highway 11 roadbed that obstructed the natural watercourse without creating a sufficient passageway for drainage. The State's design pooled water behind Highway 11 and delayed the water's arrival to downstream locations. The circuit court found that but for the Highway 11 obstruction, the rainfall of July 29–30, 2010, would not have caused any damage to Landowner's properties. The State knew, or should have known, that obstruction of the Spring Creek Tributary, absent adequate drainage, would cause flooding.

### b. Supervening causes.

[¶34.]     As a further challenge to the court's finding of causation, the State alleges that a number of supervening causes, unrelated to the State's conduct, caused the damage to Landowners' properties. The State alleges the City's failure to manage upstream run-off caused by urbanization; historic rainfall and soil saturation in July of 2010; and the rainfall event on July 29–30 combined to cause the intensity of the flood. While the State did not plead a supervening cause, it did challenge causation. In making its liability determination, the circuit court considered the State's evidence on these topics and did not find them to be established by the evidence. Specifically, the court found that the rainfall data presented by the State was "not scientifically reliable" as discussed above, *supra* ¶ 30, and that "the State failed to present sufficient evidence as to the specific effect [that urbanization had] on the flooding that occurred[.]" After a complete review of

the record, we are not left with "a definite and firm conviction that a mistake has been made." *Schieffer*, 2013 S.D. 11, ¶ 15, 826 N.W.2d at 633.

### c. Failure to meet *Krier's* consequential damages rule.

[¶35.]     The State argues, pursuant to our holding in *Krier*, that Landowners failed to establish the injury to their properties was peculiar and not of a kind suffered by the public as a whole. Additionally, the State contends that Landowners suffered the same risk shared by "all members of the public who live in areas affected by extreme rainfalls." Arguing that even properly constructed culverts can be overwhelmed by intense flood waters, the State asserts that "[g]overnment entities should not be held strictly liable for such damages."

[¶36.]     In *Krier*, landowners filed a claim for inverse condemnation alleging that a highway resurfacing project made "the ruts and potholes [on the road] worse" and caused "an accumulation of dust and dirt [to invade Krier's] property" that diminished its value. 2006 S.D. 10, ¶6, 709 N.W.2d at 844. We held that "[a] plaintiff can recover under the consequential damages rule if he or she can prove 'the consequential injury is peculiar to their land and not of a kind suffered by the public as a whole.'" *Id.* ¶ 26, 709 N.W.2d at 847-48 (quoting *State Highway Comm'n v. Bloom*, 77 S.D. 452, 461, 93 N.W.2d 572, 577 (1958)). Further, we determined that the injury "must be different in kind and not merely in degree from that experienced by the general public." *Id.* Krier did not claim "the injury to his property [was] unique from that suffered by other landowners[.]" Instead, he contended that "his property ha[d] diminished in value as a result of the resurfacing." *Id.* ¶ 28, 709 N.W.2d at 848. We found the injury to Krier's property

was the same as the injury to the other properties differing only in amount or degree. *Id.* We affirmed the circuit court's grant of summary judgment, finding "Krier ha[d] failed to produce any evidence of a separate and distinct injury[.]" *Id.*

[¶37.]     In contrast, the circuit court herein found that Landowners produced sufficient evidence to establish a distinct injury of a kind not suffered by the general public. The court found that the State's design pushed water into the closed sub-basin to delay the arrival of water downstream and to avoid overtopping Highway 11. This sub-basin was drained by a single 24-inch culvert which was "exceedingly slow to drain." Accordingly, the circuit court found that the "State created a condition that peculiarly caused flooding in the sub-basin drained by the 24[-inch] culvert." No evidence was presented by the State that other area residents or the public as a whole suffered similar flooding. From our review of the evidence produced at trial, we cannot say that the circuit court erred in applying the consequential damages rule set forth in *Krier*.

> ### 3.     *Whether the State is entitled to seek contribution or indemnification against the City due to the City's settlement with Landowners.*

[¶38.]     The State contends that pursuant to SDCL 15-8-15.2,[9] and other provisions of the Joint Tortfeasor's Act, it should have been permitted to present the issue of the City's liability to the jury and seek from the jury an apportionment of

---

9.     SDCL 15-8-15.2 provides in pertinent part, that "[i]n determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed."

fault.[10]  In response, Landowners point out that this case involves a constitutional claim for damaging property rather than a tort claim, and as such the Joint Tortfeasor's Act does not apply.  We agree with Landowners.

[¶39.]    The dispositive issue that this Court must answer is whether the State was entitled to file a cross-claim against the City for contribution under the Joint Tortfeasor's Act.  Relying primarily on a single district court case from Illinois, *Warner/Elektra/Atlantic Corp. v. County of Dupage*, 771 F. Supp. 911 (N.D. Ill. 1991), the State maintains that the Joint Tortfeasor's Act applies to inverse condemnation proceedings.  However, the State fails to recognize the specific limitations on contribution.  "At common law and prior to 1945 in this state no right of contribution existed among joint tortfeasors." *Burmeister v. Youngstrom*, 81 S.D. 578, 585, 139 N.W.2d 226, 230 (1965).  In 1945, the Legislature adopted the Joint Tortfeasor's Act. *See* 1945 S.D. Sess. Laws ch. 167.  The Act is now codified at SDCL 15-8-11 to 15-8-22.  Accordingly, the right of contribution is a statutory creature born from the Legislature.

[¶40.]    The Act specifically provides for the right of contribution between "two or more persons jointly or severally liable *in tort* for the same injury."  SDCL 15-8-11 (emphasis added).  "[I]f the language of a statute is clear, we must assume that the legislature meant what the statute says and we must, therefore, give its words and phrases a plain meaning and effect." *Caldwell v. John Morrell & Co.*, 489

---

10.    The circuit court permitted the State's cross-claim at the liability phase of the trial, but it ultimately concluded that the State failed to prove that the City was liable and dismissed the cross-claim before the case went to the jury.

N.W.2d 353, 364 (S.D. 1992). Had the Legislature intended to extend the Act to cases involving inverse condemnation, it certainly could have done so. But it did not. The State asks us to extend the statutory right because the Landowners' initial pleading contained a tort claim. However, as noted above, Landowners dismissed their tort claim well in advance of the trial and proceeded on the sole theory of inverse condemnation. The State also argues that we should apply the Act because Landowners' "theory of the case was based on negligence principles." While we recognized the similarities between inverse condemnation and tort claims in Issue 2, we applied the common-law principle of causation to inverse condemnation. And that is within our purview to do so. We must decline, however, to extend the provisions of a right created by statute. As such, the State was not entitled to file a cross-claim against the City seeking contribution under the Joint Tortfeasor's Act.

[¶41.] Moreover, even if the State was entitled to contribution under the common law relating to inverse condemnation, it failed to prove entitlement to that right. The court found that while the State alleged the south side of the City's urban development caused extra run-off contributing to the flooding, it failed "to present any evidence as to the amount of increased water caused by the urbanization of the City of Sioux Falls." The court also found the testimony of the State's expert on this issue "unconvincing and lacking in reliability." Finding no evidence of any act by the City to cause Landowners' damages, the court concluded that "[n]o equitable reason exists for the City to contribute to the damages under any legal theory, case, or statute." The circuit court, as the finder of fact, was "free to reasonably accept or reject all, part, or none" of the parties expert testimony.

-24-

*Sauer v. Tiffany Laundry & Dry Cleaners*, 2001 S.D. 24, ¶ 14, 622 N.W.2d 741, 745. After a thorough review of the record, we do not find the circuit court's findings of fact to be clearly erroneous.

[¶42.] Applying common-law principles, the dissent correctly points out the inequity of permitting Landowners to benefit from their settlement with the City as they will have recovered more than their actual losses. *Infra* ¶ 83. Although the law on eminent domain does not entitle Landowners to recover more than their total losses, the State did not make that claim to the trial court. Rather, the State asked the court to submit the State's claim for contribution and indemnity from the City to the jury for apportionment. The State did not ask the trial court to reduce the judgment Landowners recovered from the State based on the theory that Landowners recovered more than their actual losses. This Court has provided that, on appeal, it "may require a reduction or remission of the amount awarded as a condition of affirming the judgment" but only "where it appears that the amount awarded is excessive *and* is based on evidence that is speculative and conjectural." *Bloom*, 77 S.D. at 470, 93 N.W.2d at 582 (emphasis added). While Landowners' award was excessive, it was not based on speculation or conjecture.

[¶43.] Further, on appeal, the State only seeks recovery under the Joint Tortfeasor's Act. Recovery under the Joint Tortfeasor's Act provides only one remedy, and that remedy is only against the joint tortfeasor who has not paid its proportional share, in this case the City. *See* SDCL 15-8-12 ("The right of contribution exists among joint tort-feasors."). The Act does not provide for recovery against the party that was injured.

### 4. *Whether the State has a drainage easement over Landowners' real estate.*

[¶44.]     Finally, relying on *Heezen v. Aurora County*, the State contends that the circuit court erred in refusing to grant the State a "permanent drainage easement" over Landowners' properties. 83 S.D. 198, 157 N.W.2d 26 (1968). The State submits that Landowners should not be compensated for both permanent damage to their properties and for future floods. Landowners respond that "[d]uring five years of litigation, a drainage easement over the property was never pled, never argued, never described, never valued, never noticed, and never even mentioned [by the State]."

[¶45.]     At the conclusion of the trial on liability in this case, the court entered a judgment providing that "[t]he State acquires no estate or property interest in the land of [Landowners]." The matter then moved to the damages phase. After the jury verdict awarding permanent damages was returned, the State submitted proposed judgments to the trial court. Each of the State's proposed judgments contained the following language: "As a result of the permanent taking, [the] State has acquired a drainage easement over the subject property in perpetuity." The trial court refused the State's proposed judgments. Throughout the bifurcated trials on liability and damages, the State had never requested a permanent drainage easement over Landowners' properties. The State failed to notice, plead, value, describe, or offer a legal basis for such an easement.

[¶46.]     In *Heezen*, Landowners brought a claim against Aurora County for inverse condemnation alleging both temporary and permanent damages. 83 S.D. at 200, 157 N.W.2d at 28. Landowners alleged that their properties were flooded by

overflow from a local lake and that the overflow was caused by the county's diversion of water. *Id.* The circuit court found for Landowners and granted both permanent damages for the flooding and an injunction prohibiting the county from diverting water onto Landowners' properties. *Id.* The Court reversed the award of injunctive relief on appeal. 83 S.D. at 207, 157 N.W.2d at 31-32. It determined that the grant of both injunctive relief and permanent damages was inconsistent. *Id.* It was inconsistent because when a landowner is compensated for a permanent taking of their property, "it would follow that the county [is] being required to pay for the right to permanently flood [the property] to the extent of the flooding here involved." 83 S.D. at 207, 157 N.W.2d at 31. The Court stated, "To enjoin a party from causing water to flow onto an area that it had acquired the right to permanently flood would create an anomalous situation." 83 S.D. at 207, 157 N.W.2d at 32.

[¶47.]     Although *Heezen* generally stands for the proposition that an award of both permanent damages and an injunction is inconsistent, it also suggests that a condemning authority obtains the right to continually damage the property when permanent damages are awarded in an inverse condemnation claim. *See id.* This is compatible with our definition of permanent damages. Damage to real property is permanent when it is "of such a character and existing under such circumstances that it will be presumed to continue indefinitely . . . ." *Rupert*, 2013 S.D. 13, ¶ 23, 827 N.W.2d at 65 (quoting *Gross v. Conn. Mut. Life Ins. Co.*, 361 N.W.2d 259, 272 (S.D. 1985)).

[¶48.]     But the present case is distinguishable from *Heezen*. In *Heezen*, the Court merely held that the award of both injunctive relief and permanent damages was inconsistent. It reversed on this basis. The Court did not grant an easement, nor did it remand with instructions to enter an easement. Rather, the Court declared that the condemnor had a "right to permanently flood [the property] to the extent of the flooding here involved." *Heezen*, 83 S.D. at 207, 157 N.W.2d at 31. In keeping with *Heezen*, the State, in the present case, has a right to permanently flood Landowners' properties "to the extent of the flooding here involved."

[¶49.]     We agree with the general notion that the State can obtain an easement in an inverse condemnation action when permanent damages are awarded.[11] But in this case, the State failed to define the scope and boundaries of any purported easement or present evidence on valuation.[12] The State simply

---

11.     *See, e.g., K & W Elec., Inc. v. State*, 712 N.W.2d 107, 116 (Iowa 2006) ("When the flooding is intermittent rather than continual, the fee remains in the property owner, subject to an easement in the governmental entity to overflow the property with water.").

12.     Under eminent domain procedures, the condemning authority must describe the property to be taken or damaged and clearly state the purpose for which the property is being taken or damaged. SDCL 21-35-2; *see also Lawrence Cty. v. Miller*, 2010 S.D. 60, ¶ 30, 786 N.W.2d 360, 371 (reiterating that the description in SDCL 21-35-2 must be made with "substantial accuracy-that certainty by means of which a reasonably competent person could take the instrument and therefrom, aided by such inquiries as it suggests, locate the identical property . . . the certainty required in the description of the land in a condemnation proceeding 'is of the same nature as that required in conveyances of land, so that a surveyor could go upon the land and mark out the land designated.'" (quoting *City of Sioux Falls v. Mo. Basin Mun. Power Agency*, 2004 S.D. 14, ¶ 12, 675 N.W.2d 739, 742-43)). Failure to adequately describe the property results in dismissal of the action. *Id.* We see no reason why this requirement should greatly differ in an inverse condemnation
(continued . . .)

submitted language in its proposed judgment requesting "a drainage easement over the subject property in perpetuity." Such a broad grant leaves many unanswered questions. For example, under the requested easement, may the State enter and remain on Landowners' properties; work in the easement area; construct or place equipment and other items on Landowners' properties? If permitted to do so, must the State pay separately for any resulting damages caused by construction or maintenance on Landowner's properties?

[¶50.] Because of these unanswered questions, we rely on *Heezen* and the principle of res judicata to provide more specific relief in this case. Because Landowners were awarded permanent damages, their properties cannot be twice the subject of compensation for similar recurrent flooding. In instances where permanent damages are awarded for a harm that "will continue indefinitely into the future" the principles of res judicata apply to prevent future claims for similar damages. 1 Dan B. Dobbs, *Law of Remedies* § 5.11(1), at 821 (2d ed. 1993); *see also Owen v. City of Springfield*, 741 S.W.2d 16, 18-19 (Mo. 1987) (en banc) (barring subsequent recovery in inverse condemnation claim under principles of res judicata because plaintiffs were previously compensated in prior action).[13] The adjudication

---

(. . . continued)
    proceeding when the State affirmatively seeks an easement as alternative relief.

13.    "[T]he doctrine of res judicata bars any 'attempt to relitigate a cause of action by the parties or one of the parties in privity to a party to an earlier suit.'" *Miller*, 2010 S.D. 60, ¶ 24, 786 N.W.2d at 369 (quoting *Dakota Plains AG Center, LLC v. Smithey*, 2009 S.D. 78, ¶ 19, 772 N.W.2d 170, 179). Res judicata applies when (1) "the issue decided in the former adjudication was identical to the present issue;" (2) there was "a final adjudication on the

(continued . . .)

herein involved an award of damages for flooding during an eight-year-rain event with the twin 48-inch and single 24-inch culvert design in place. Landowners have been fully compensated with permanent damages for flooding under those facts and the properties may no longer be the subject of claims for the same type of flooding.

## CONCLUSION

[¶51.]     Landowners had a right to sue for just compensation under the theory of inverse condemnation directly pursuant to Article VI, § 13 of the South Dakota Constitution. Sovereign immunity is "essentially abrogated" for such claims. The circuit court found that Landowners' damages were caused by the State's construction of Highway 11 which obstructed the natural drainage of the Spring Creek Tributary. The damages were foreseeable. The State's design provided insufficient passageway for drainage to the natural watercourses. The findings are supported by the record and not clearly erroneous. The flood damages suffered by Landowners were peculiar to their properties and not of a kind suffered by the public as a whole. The State was not entitled to contribution from the City. Landowners were fully compensated by the jury for the diminution in value of their property caused by the flood and the properties' susceptibility to recurrent flooding. Although the State has not acquired an easement to flood the properties, res judicata will bar any future claims for damages caused by flooding to the same

---

(. . . continued)

merits;" (3) "the parties in the two actions [were] the same or in privity;" and (4) there was "a full and fair opportunity to litigate the issues in the prior adjudication[.]" *D.G. v. D.M.K.*, 1996 S.D. 144, ¶ 27, 557 N.W.2d 235, 240 (quoting *Wintersteen v. Benning*, 513 N.W.2d 920, 921 (S.D.1994)).

extent and in the same manner as proven at trial for which Landowners were compensated.

[¶52.] Affirmed.

[¶53.] SEVERSON, Justice, concurs.

[¶54.] ZINTER, Justice, concurs specially.

[¶55.] GILBERTSON, Chief Justice, and BARNETT, Circuit Judge, dissent.

[¶56.] BARNETT, Circuit Judge, sitting for WILBUR, Retired Justice, disqualified.

[¶57.] JENSEN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

ZINTER, Justice (concurring specially).

[¶58.] I join the Court's opinion. I write to emphasize that this case was not tried on the numerous, new theories raised by the dissent. It was not tried on the theory that landowners could recover in inverse condemnation only if they identified specific evidence showing that the damage to their homes in 2010 was foreseeable in 1949 when the State might have taken other property to construct the highway.[14] It was also not tried on:

- the theory that landowners were not entitled to sue because the right to damage their properties was within the scope of an assumed 1949 taking;

---

14. The State's theory was that Landowners failed to prove causation because the rain event was either an act of God or supervening event, or that increased urbanization contributed to excess run-off and soil saturation. Temporal foreseeability was not argued or addressed.

- the theory that the right to compensation for the flooding in 2010 belongs only to the landowners who owned the properties in 1949 and not the plaintiffs;
- the theory that the State was acquiring a flooding easement; and
- the novel theory that under the law of *contribution and indemnity*, a *plaintiff's recovery* must be *directly* offset by the settlement received from a *codefendant*, especially a codefendant who has not been determined to be liable.

Although some of these theories present interesting questions for a future case, they were not the issues upon which this case was tried. And because, with the exception of the easement issue, these specific theories were also not briefed on appeal,[15] the Court correctly declines to now try them in this appeal.

[¶59.]     This was an extremely complicated and highly technical case. It was tried on contested facts with many experts opining on the cause of the flooding and the defendants' roles in causing it. But those were factual matters, and there was substantial conflicting testimony on both sides of the issues. The case was fairly tried, and the circuit court and jury were within their authority to have adopted either view. There was certainly no *reversible* error in the circuit court's failure to enter findings of fact and conclusions of law on theories it was never asked to consider.

GILBERTSON, Chief Justice (dissenting).

[¶60.]     I respectfully dissent. The State's construction of Highway 11 in 1949 is not a proximate cause of Landowners' loss in 2010 because such loss was not the

---

15.     The State briefed the general issues of causation, but not temporal foreseeability. The State briefed contribution and indemnity, but only as a cross-claim against the codefendant City.

natural and probable consequence of the construction of Highway 11. And if it was the natural and probable consequence, then such loss was already within the scope of the State's right to construct Highway 11. That aside, if the State is required to compensate Landowners, then under the facts of this case, the State necessarily has a permanent drainage easement. Finally, Landowners' settlement with the City should have been deducted from the amount of compensation awarded by the jury. Therefore, I would reverse.

### 1. Landowners did not prove the construction of Highway 11 is a proximate cause of their loss.

[¶61.]     The State argues that the construction of Highway 11 in 1949 is not a proximate cause of Landowners' loss in 2010. According to the South Dakota Constitution, "Private property shall not be taken for public use, or damaged, without just compensation . . . ." S.D. Const. art. VI, § 13. "An inverse condemnation action is an eminent domain proceeding initiated by the property owner rather than the condemner." *Schliem v. State ex rel. Dep't of Transp.*, 2016 S.D. 90, ¶ 13 n.9, 888 N.W.2d 217, 224 n.9 (quoting *Breidert v. S. Pac. Co.*, 394 P.2d 719, 721 n.1 (Cal. 1964) (en banc)). "Inverse condemnation law is tied to, and parallels, tort law. One of the principles of tort law that is applicable to the inverse condemnation context is proximate cause." 9 Patrick J. Rohan & Melvin A. Reskin, *Nichols on Eminent Domain* § G34.03[1] (3d ed., rel. 125-5/2017); *see also Schliem*, 2016 S.D. 90, ¶ 14, 888 N.W.2d at 224 (limiting compensation under Article VI, § 13, to legal injuries). A property owner who fails to establish proximate causation is not entitled to compensation. *See* 9 Rohan & Reskin, *supra*, § G34.03[1].

[¶62.] As the Court notes, "[p]roximate cause is defined as 'a cause that produces a result in a natural and probable sequence *and* without which the result would not have occurred.'" *Howard v. Bennett,* 2017 S.D. 17, ¶ 7, 894 N.W.2d 391, 395 (emphasis added) (quoting *Hamilton v. Sommers,* 2014 S.D. 76, ¶ 39, 855 N.W.2d 855, 867). The first half of this definition requires the plaintiff to prove the loss was foreseeable. *Hamilton,* 2014 S.D. 76, ¶ 39, 855 N.W.2d at 867; *State v. Ruth,* 9 S.D. 84, 92-93, 68 N.W. 189, 191 (1896) ("[I]n order to warrant a finding that . . . an act . . . is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the . . . act, and that it ought to have been foreseen, in the light of the attending circumstances."). The second half requires the plaintiff to prove the conduct complained of is a but-for cause of the loss. *Compare Howard,* 2017 S.D. 17, ¶ 7, 894 N.W.2d at 395 (requiring a cause to be one "without which the result would not have occurred" (quoting *Hamilton,* 2014 S.D. 76, ¶ 39, 855 N.W.2d at 867)), *with Cause, Black's Law Dictionary* (10th ed. 2014) (defining the term *but-for cause* as "[t]he cause without which the event could not have occurred"). Thus, proving but-for causation is not sufficient to establish a right to compensation—the plaintiff also has the burden of proving foreseeability.

[¶63.] In this case, Landowners had the burden of proving their losses were foreseeable (i.e., probable) at the time the State constructed Highway 11. *Hyde v. Minn., Dak. & Pac. Ry. Co.,* 29 S.D. 220, 231, 136 N.W. 92, 96 (1912) ("The damages to be recompensed for under the law of eminent domain are . . . only such as could be anticipated by a jury in the trial of an action brought before the 'damage' had

taken place.").[16] The circuit court found that when Highway 11 was constructed in 1949, the surrounding area was undeveloped farmland. The first of Landowners' homes was not constructed until 1974. The court also found that none of Landowners' properties had been flooded prior to July 2010. And as Landowners recognized in their complaint, the upstream population contributing to runoff increased significantly between 1949 and 2010.[17] Thus, Landowners had the

16. The Court claims this issue statement "misapprehends how this Court views foreseeability as it relates to duty and causation." *Supra* ¶ 27. According to the Court, "Landowners are not required to prove that their losses were foreseeable when the State constructed Highway 11 in 1949[.]" *Id.* There are several problems with this claim.

First and most importantly, the Court's claim directly contradicts this Court's controlling precedent as well as other authorities. *Compare Hyde*, 29 S.D. at 231, 136 N.W. at 96 ("The damages to be recompensed for *under the law of eminent domain* are . . . such as could be *anticipated* by a jury in the trial of an action brought *before* [(i.e., not after)] the 'damage' had taken place." (emphasis added)), *and* 4A Julius L. Sackman, *Nichols on Eminent Domain* § 14.03[2][c][iv] (3d ed., rel. 124-11/2016) ("Damages that are too remote to have been foreseeable *at the time of the taking* . . . are not consequences of the taking and are generally not recoverable as just compensation." (emphasis added)), *with supra* ¶ 27 ("Landowners are not required to prove that their losses were foreseeable when the State constructed Highway 11 in 1949[.]").

Moreover, the case relied on by the Court only undermines the Court's conclusion that Landowners were not required to prove their losses were foreseeable when the action at issue occurred. Like the statement it disagrees with, the Court claims that "[t]he standard is whether the damage 'ought to have been *foreseen* in the light of the attending circumstances.'" *Supra* ¶ 27 (emphasis added) (quoting *Musch v. H-D Coop., Inc.*, 487 N.W.2d 623, 625 (S.D. 1992)). In *Musch*, we specifically rejected the view that foreseeability should be determined by "looking back from the harm to the actor's . . . conduct[.]" 487 N.W.2d at 624, 626 (quoting Restatement (Second) of Torts § 435 (Am. Law Inst. 1965)).

17. In their complaint, Landowners asserted that "[t]he population of Sioux Falls in 1950 was approximately 52,699 and the surrounding metropolitan statistical area totaled 70,910." They also asserted that "[i]n 2010, the population of Sioux Falls was 156,500 and the municipal statistical area was

(continued . . .)

burden of proving that when the State constructed Highway 11 in 1949, it was *probable*—not merely *possible*—that 61 years later, runoff from a population base more than triple the size of that in 1949 would combine with severe rainstorms to destroy homes that had not been built in a community that did not exist.

[¶64.] Landowners did not provide any evidence relevant to the question of foreseeability. The circuit court's factual findings do not address this issue.[18] Likewise, in their brief to this Court, Landowners argue only that "[a]bsent the State improvement, water would have flown [sic] freely from the properties." As the Court notes, Landowners' expert witness "concluded that without the Highway 11 blockage, the water would not have gone over the ditch block south of the 48-inch culverts, down the west ditch of Highway 11, causing damage to Landowners' properties." *Supra* ¶ 24. And in their brief to this Court, Landowners similarly summarize their expert's testimony: "Mr. Mainelli testified that *but for* the State's obstruction of the natural drainageway with Highway 11 and the inadequate culverts passing underneath, the property would not have flooded." (Emphasis added.) Thus, these findings and this testimony only establish but-for causation (i.e., that the construction of Highway 11 is a cause "without which the result would not have occurred"). *See Howard*, 2017 S.D. 17, ¶ 7, 894 N.W.2d at 395; *Cause*,

---

(. . . continued)
235,300." Thus, according to Landowners' pleadings, the Sioux Falls area experienced an increase in population of greater than 300% between the time of Highway 11's construction and the flooding of Landowners' properties in 2010.

18. In fact, the circuit court's factual findings do not explicitly identify the act that amounted to condemnation, nor do they identify the date of taking. This alone warrants reversal and remand.

*Black's Law Dictionary* (10th ed. 2014). These findings and this testimony simply do not address the question of foreseeability.[19]

[¶65.]    In light of the foregoing, Landowners are not entitled to compensation. As previously noted, Landowners had the burden of proving proximate causation. 9 Rohan & Reskin, *supra* ¶ 61, § G34.03[1]. While Landowners' expert testimony establishes that the construction of Highway 11 is a but-for cause of Landowners' loss, it does not address the question whether Landowners' loss in 2010 is the natural and probable consequence of the construction of Highway 11 in 1949. In other words, Landowners' evidence does not address foreseeability—a necessary component of proximate causation. *Hamilton*, 2014 S.D. 76, ¶ 39, 855 N.W.2d at 867; *Ruth*, 9 S.D. at 92-93, 68 N.W. at 191. Because the Court today affirms solely on a showing of but-for causation, any public improvement undertaken by the State will result in essentially unlimited liability. As the United States Supreme Court has noted:

> In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of

---

19.    The Court concludes that "[a]lthough the court did not use the precise terms of 'foreseeability' or 'natural and probable sequence,' the court's findings are sufficient to sustain a finding of foreseeability for the purpose of proximate cause." *Supra* ¶ 28. Yet, the only factual finding identified by the Court that even remotely addresses any concept of foreseeability is the circuit court's finding that "the State knew or should have known that an eight-year rain event and above would cause flooding to Plaintiffs' property as a result of the Highway 11 blockage of the natural drainage." *Id.* But as the Court acknowledges, this finding refers only to the adequacy of drainage *at the time of the 2010 resurfacing project.* This finding does not refer to the adequacy of drainage at the time Highway 11 was constructed in 1949—when the surrounding area was farmland, devoid of residences, and subject to runoff from a substantially smaller population base. The circuit court explicitly found that none of the properties at issue had ever flooded prior to 2010.

> human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would "set society on edge and fill the courts with endless litigation."

*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 266 n.10, 112 S. Ct. 1311, 1316 n.10, 117 L. Ed. 2d 532 (1992) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 41, at 264 (5th ed. 1984)).[20] Therefore, the absence of evidence on the issue of foreseeability is singularly sufficient to warrant reversal.

### 2. Even if the construction of Highway 11 is a proximate cause of Landowners' loss, their claims are barred by sovereign immunity.

[¶66.] The State argues that Landowners' claims "sounded in tort" and are therefore barred by the doctrine of sovereign immunity. Landowners respond that their cause of action is indeed one of inverse condemnation. While the State is generally immune to liability for the torts of negligence and trespass, the State cannot avoid liability when it invokes its sovereign power of eminent domain. *See Rupert v. City of Rapid City*, 2013 S.D. 13, ¶ 43, 827 N.W.2d 55, 71. Therefore, in determining whether Landowners are entitled to compensation, the threshold question in this case is whether the claim presented by Landowners is actually one of inverse condemnation or if it is instead one of tort. In answering this question, we may not simply accept the label used in the complaint. "[T]he viability of a takings claim is dependent upon 'situation-specific factual inquiries.'" *Id.* ¶ 10,

---

20. There is no basis for a bright-line rule of compensation commencing in 1949. While this specific road was constructed in 1949, South Dakota has been constructing roads since statehood in 1889, and under the Court's theory, South Dakota would assume liability to a private landowner who experiences such a flood loss no matter when the highway was constructed.

827 N.W.2d at 61 (quoting *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 32, 133 S. Ct. 511, 518, 184 L. Ed. 2d 417 (2012)).

[¶67.]     As we recently explained, "a landowner is not entitled to compensation under Article VI simply because he has suffered some loss or his property has been devalued as a result of state action." *Schliem*, 2016 S.D. 90, ¶ 14, 888 N.W.2d at 224. "[T]he word *damaged*, as used in the South Dakota Constitution, contemplates only legal injury." *Id.* ¶ 14, 888 N.W.2d at 225. Legal injury does not exist when an alleged loss falls within the scope of a right previously acquired by the State. *See State ex rel. Dep't of Transp. v. JB Enters., Inc.*, 2016 S.D. 89, ¶ 27 n.4, 889 N.W.2d 131, 138 n.4; *Morris Family, LLC ex rel. Morris v. S.D. Dep't of Transp.*, 2014 S.D. 97, ¶ 20, 857 N.W.2d 865, 872; *Kirby v. Citizens' Tel. Co. of Sioux Falls*, 17 S.D. 362, 365-67, 97 N.W. 3, 4 (1903); *Hannaher v. St. Paul, Minneapolis & Man. Ry. Co.*, 5 Dakota 1, 16-17, 37 N.W. 717, 721-22 (1888). Thus, when the State acquires the right to construct a highway, an inverse-condemnation action may not be subsequently maintained "if the injury complained of was a *natural and probable* result of the construction[.]" *Hannaher*, 5 Dakota at 16, 37 N.W. at 722 (emphasis added), *cited with approval in White v. Chi., Milwaukee & St. Paul Ry. Co.*, 1 S.D. 326, 331, 47 N.W. 146, 147 (1890).

[¶68.]     This Court's predecessor decided a substantially similar issue in *Hannaher v. St. Paul, Minneapolis & Manitoba Railway Co.*, 5 Dakota 1, 37 N.W. 717 (1888). In that case, a railway company obtained the right to construct a railroad across the land of several property owners. *Id.* at 8, 37 N.W. at 717-18. The company placed the tracks on a two-foot-tall embankment it constructed using

earth removed from an adjacent ditch. *Id.* The embankment and ditch altered the existing natural watercourse, causing water to travel down the ditch and discharge onto crop land that had not previously been flooded. *Id.* In holding there was no right to compensation, the Supreme Court of the Territory of Dakota said:

> The company condemns or purchases its right of way for railroad purposes. It builds its road, with its enbankments [sic], ditches, and culverts, for railroad purposes, and it is only required to construct its road in a manner suitable and proper for railroad purposes. And in payment for its right of way it is required to make compensation for the injuries sustained by the adjacent land-owners by the use of such right of way granted or condemned for railroad purposes. . . . [T]he company is required to pay such damages as may reasonably and naturally follow from the occupation of its right of way for railroad purposes . . . . It follows, as a necessary corollary, that, *if the injury complained of was a natural and probable result of the construction of the railroad along the right of way granted by plaintiffs, it was compensated for in the consideration of the grant, and an action cannot be maintained therefor.*

*Id.* at 16, 37 N.W. at 722 (emphasis added). For purposes of eminent domain, a railroad is a highway. *See* S.D. Const. art. VI, § 13 ("The fee of land taken for railroad tracks *or other highways* shall remain in such owners, subject to the use for which it is taken." (emphasis added)). Thus, the construction of a highway in the present case is not materially distinguishable from the construction of a railroad in *Hannaher*.

[¶69.]    In light of the foregoing, Landowners are not entitled to compensation. If the flooding that occurred is a natural and probable consequence of the State's construction of Highway 11, then such is within the scope of a taking that occurred in 1949. *See Hannaher*, 5 Dakota at 16, 37 N.W. at 722; *see also JB Enters., Inc.*, 2016 S.D. 89, ¶ 27 n.4, 889 N.W.2d at 138 n.4; *Morris Family, LLC*, 2014 S.D. 97, ¶ 20, 857 N.W.2d at 872; *Kirby*, 17 S.D. at 365-67, 97 N.W. at 4. Regardless of

whether the State ever paid compensation for that taking, the right to such compensation does not belong to Landowners. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 628, 121 S. Ct. 2448, 2463, 150 L. Ed. 2d 592 (2001) ("[I]t is a general rule of the law of eminent domain that any award goes to the owner at the time of the taking, and that the right to compensation is not passed to a subsequent purchaser."), *quoted in Johns v. Black Hills Power, Inc.*, 2006 S.D. 85, ¶ 12, 722 N.W.2d 554, 558. Thus, Landowners do not have an inverse-condemnation claim. As originally pleaded in their complaint, Landowners' claim is simply one of negligence and trespass, which as the State points out, is barred by the doctrine of sovereign immunity. *See Rupert*, 2013 S.D. 13, ¶ 43, 827 N.W.2d at 70-71. Therefore, in the alternative, I would also reverse on this basis.

### 3. If Landowners are entitled to compensation, the State necessarily has a drainage easement.

[¶70.] Alternatively, the State argues that if the jury verdict is affirmed, Landowners should not be compensated for future floods. Quoting *Heezen v. Aurora County*, 83 S.D. 198, 207, 157 N.W.2d 26, 31 (1968), the State contends it will have "paid 'for the right to permanently flood' [Landowners'] properties." Landowners respond that "[t]he State's request for a permanent drainage easement over Landowner's real estate is as bizarre as it is offensive" and that "a drainage easement over the property was never pled, never argued, never described, never valued, never noticed, and never even mentioned." While the Court agrees "that the State can obtain an easement in an inverse condemnation action when permanent damages are awarded[,]" the Court nevertheless concludes that the State had the burden of specifically defining such easement and that the State failed to do so.

*Supra* ¶ 49. Even so, drawing a distinction between an "easement" and a "right" of use, the Court goes on to hold that "the State . . . has a right to permanently flood Landowners' properties 'to the extent of the flooding here involved.'" *Supra* ¶ 48 (quoting *Heezen*, 83 S.D. at 207, 157 N.W.2d at 31).

[¶71.]     This issue turns on understanding the difference between government action that *takes* property and government action that merely *damages* property. Property is taken when the State appropriates it for public use; property is damaged when the State does not appropriate it but nevertheless deprives its owner of its use. *See Schliem*, 2016 S.D. 90, ¶ 12, 888 N.W.2d at 223-24; *Hyde*, 29 S.D. at 229, 136 N.W. at 95. The distinction is critical in this case. If the basis for Landowners' claim to compensation is that the State appropriated Landowners' property for the public use of holding overflow from the Spring Creek Tributary, then the necessary implication of Landowners' claim is that the State already has such an easement. Thus, our choices would be either to (1) recognize the State's appropriation of Landowners' property and grant compensation for it or (2) deny the existence of the easement and, therefore, deny compensation.

[¶72.]     Landowners' pleadings and argument allege the State *appropriated* their property for public use. Throughout this litigation, Landowners have continually asserted—and the circuit court found—that the State caused their properties to be invaded by water and that such invasions would recur indefinitely. It is well established that the physical invasion of property is an appropriation of that property—i.e., a taking. *E.g., Schliem*, 2016 S.D. 90, ¶ 12, 888 N.W.2d at 223; *Searle v. City of Lead*, 10 S.D. 312, 316, 73 N.W. 101, 103 (1897) ("[W]here . . . the

estate [is] actually invaded by superinduced additions of water . . . so as effectually to destroy or impair its usefulness, it is a 'taking,' within the meaning of the constitution."). It is equally well established that periodic flooding imposes a permanent liability on land and is, therefore, a permanent taking. *E.g.*, *Ark. Game & Fish Comm'n*, 568 U.S. at 32, 133 S. Ct. at 519 ("[R]egularly recurring flooding [gives] rise to a *takings* claim . . . ." (emphasis added)).[21] So whether Landowners realized it or not, their argument from the beginning has necessarily been that the State permanently *appropriated* their land for the purpose of draining water—i.e., that the State took a drainage easement. There is nothing "bizarre" or "offensive" about the State holding Landowners to their own assertions.[22]

---

21. *See also United States v. Cress*, 243 U.S. 316, 329, 37 S. Ct. 380, 385, 61 L. Ed. 746 (1917) ("[W]here . . . land is not constantly but only at intervals overflowed, the fee may be permitted to remain in the owner, subject to an easement in the [State] to overflow it with water . . . ."); *Long v. City of Athens*, 24 So. 3d 1110, 1118 (Ala. Civ. App. 2009); *K & W Elec., Inc. v. State*, 712 N.W.2d 107, 116 (Iowa 2006); *Spaeth v. City of Plymouth*, 344 N.W.2d 815, 822 (Minn. 1984); *Allianz Global Risks U.S. Ins. Co. v. State*, 13 A.3d 256, 260 (N.H. 2010); *Lea Co. v. N.C. Bd. of Transp.*, 304 S.E.2d 164, 175 (N.C. 1983); *State ex rel. Doner v. Zody*, 958 N.E.2d 1235, 1248-49 (Ohio 2011); *State ex rel. Dep't of Transp. v. Hoebel*, 594 P.2d 1213, 1215 (Okla. 1979) ("The majority rule in this country is that flooding, whether permanent or recurring, may constitute a [*t*]*aking* if the flooding is severe enough so as to effectively destroy or impair the land's usefulness." (emphasis added)); *Dunn v. City of Milwaukie*, 328 P.3d 1261, 1271 n.13 (Or. 2014) (en banc); *Colum. Venture, LLC v. Richland Cty.*, 776 S.E.2d 900, 911 (S.C. 2015); *Bennett v. Tarrant Cty. Water Control & Imp't Dist. No. 1*, 894 S.W.2d 441, 449 (Tex. App. 1995); *Colman v. Utah State Land Bd.*, 795 P.2d 622, 627 (Utah 1990).

22. Landowners argue their pleadings do not claim the State "took" property. However, the label used by Landowners is not dispositive. The question whether the State appropriated a property interest or merely infringed on one without appropriating it is determined by the facts of the case. *See Rupert*, 2013 S.D. 13, ¶ 10, 827 N.W.2d at 61 ("[T]he viability of a takings

(continued . . .)

[¶73.]     In light of Landowners' pleadings and argument, this case should be resolved like *Heezen*, which is materially indistinguishable from the present case. In *Heezen*, several property owners filed an inverse-condemnation action alleging that the regrading of a highway diverted water into a lake from a watershed that had not previously drained into the lake. *Heezen*, 83 S.D. at 200, 157 N.W.2d at 28. The extra drainage increased the lake's depth from about 3 feet to 12 feet, causing it to overflow and flood the plaintiffs' properties. *Id.* at 203, 157 N.W.2d at 29. The circuit court concluded a taking had occurred, and it awarded both compensation and an injunction in favor of the property owners. *Id.* at 200, 204, 157 N.W.2d at 28, 30. On appeal, we affirmed the award of compensation but reversed the injunctive relief. *Id.* at 207, 157 N.W.2d at 31-32. We noted:

> In trying and deciding [the complaints,] the measure of damages
> applied by the court was the difference in market value of these

---

(. . . continued)
claim is dependent upon 'situation-specific factual inquiries.'" (quoting *Ark. Game & Fish Comm'n*, 568 U.S. at 32, 133 S. Ct. at 518)).  By arguing the State subjected their properties to recurring flooding, Landowners necessarily argued the State permanently burdened their properties, thereby appropriating a property interest—i.e., that the State *took* property.

Landowners also argue the State may not appropriate a property interest outside of formal condemnation proceedings.  On the contrary, "[s]tate courts have defined 'inverse condemnation' . . . as a cause of action against a governmental defendant to recover the value of property *that has been taken in fact* by the governmental defendant, *even though no formal exercise of the power of eminent domain has been attempted* by the taking agency."  3 Julius L. Sackman, *Nichols on Eminent Domain* § 8.01[5][b][i] (3d ed., rel. 124-11/2016) (emphasis added); *see also Agins v. City of Tiburon*, 447 U.S. 255, 258 n.2, 100 S. Ct. 2138, 2140 n.2, 65 L. Ed. 2d 106 (1980).  This Court has expressly recognized that an uncompensated appropriation of property is nevertheless an appropriation of property.  *See Johns*, 2006 S.D. 85, ¶ 12, 722 N.W.2d at 558 (concluding land upon which telephone pole and guy wires were placed had been appropriated without prior compensation and denying compensation to subsequent purchaser).

> farms before and after the flooding. This is the measure of compensation which governs where part of a tract is permanently taken or damaged. *From this it would follow that the county was being required to pay for the right to permanently flood these farms to the extent of the flooding here involved.* The injunctive and mandatory provisions of these judgments are inconsistent with such right.

*Id.* at 206-07, 157 N.W.2d at 31 (emphasis added); *see also* 9 Rohan & Reskin, *supra* ¶ 61, § G34.03[3][b] ("[A] landowner cannot obtain injunctive relief and get damages for a permanent taking."). Notably, we did not require a detailed, metes-and-bounds description of the resulting easement. We simply defined the easement in terms of what the property owners had proven—i.e., "to the extent of the flooding here involved." *Heezen*, 83 S.D. at 207, 157 N.W.2d at 31.

[¶74.] As in *Heezen*, the measure of compensation awarded in the present case was the difference in the fair market value of the properties before and after the flooding. Thus, Landowners are being compensated for a permanent taking. "From this it would follow that the [State is] being required to pay for the right to permanently flood these [properties] *to the extent of the flooding here involved.*" *Id.* (emphasis added). In practical terms, if the State is required to compensate Landowners for a permanent taking, then the State has simply paid for the right to leave Highway 11 as it has existed for the last 68 years. Under *Heezen*, no more is required to define the property interest that Landowners assert the State appropriated in this case.

[¶75.] Despite claiming to "rely on *Heezen*," *supra* ¶ 50, the Court disregards a number of widely accepted principles of inverse condemnation. While the Court accepts the circuit court's findings that the State physically invaded Landowners' land and will do so again during every eight-year-or-greater rain event, it

nevertheless claims "the State failed to define the scope and boundaries of any purported easement or present evidence on valuation." *Supra* ¶ 49. According to the Court, "the principle of res judicata . . . provide[s] more specific relief in this case." *Supra* ¶ 50. There are several problems with the Court's analysis.

[¶76.]    First and foremost, it is erroneous to view the State's claim of an easement as a counterclaim for which this Court may choose a particular "relief." As explained above, the premise of Landowners' claim is that the State permanently appropriated their land for public use. Thus, if Landowners are entitled to compensation based on their claim, the State necessarily already has an easement (i.e., a right to use Landowners' property for a specific, limited purpose) by virtue of its sovereign power of eminent domain. And if the State does not already have an easement, then there is no basis for compensating Landowners.

[¶77.]    The Court's view also incorrectly assigns the burden of proof to the State. In an inverse-condemnation action, it is the aggrieved property owner who has the burden of proving the State appropriated a property interest. 5 Julius L. Sackman, *Nichols on Eminent Domain* § 18.02[2][a] (3d ed., rel. 112-12/2013). Such proof necessarily includes specifically identifying the property interest taken. If the property owner is successful, the property interest formally appropriated by the State is simply that identified by the property owner. As in *Heezen*, because the burden of proof is on the property owner, the property interest appropriated by the State is whatever the property owner proves the State took. *See* 83 S.D. at 206-07, 157 N.W.2d at 31. Thus, there is no need for the State to introduce evidence establishing a taking that it claims did not occur. *See Rupert*, 2013 S.D. 13, ¶ 37,

827 N.W.2d at 68 ("In condemnation cases, the governmental entity essentially admits that a taking will occur because it institutes the formal condemnation proceedings to do so. In contrast, in inverse condemnation cases, the governmental entity may dispute whether or not a taking or damaging of private property has even occurred."). If the easement at issue has not been properly identified, then it is the property owner who has failed to prove an essential element of the claim.

[¶78.]     The Court's claim that the State failed to introduce evidence establishing the before-and-after market values of the properties is similarly problematic. "On the question of damages in an inverse condemnation proceeding, the burden of proof is on the landowner." 3 Julius L. Sackman, *Nichols on Eminent Domain* § 8.01[5][d] (3d ed., rel. 96-12/2009). By not introducing evidence of valuation, the State merely runs the risk of paying more than it should by not disputing the property owner's valuations.

[¶79.]     Additionally, the Court does not explain any meaningful distinction between *Heezen* and the Court's claim-preclusion approach.[23] As noted above, this Court did not require a particular description for the easement recognized in

---

23.     The Court cites a single opinion from Missouri for its suggestion that the doctrine of claim preclusion can justify denying the State an easement for which it has been required to pay compensation. *Supra* ¶ 50 (citing *Owen v. City of Springfield*, 741 S.W.2d 16, 18-19 (Mo. 1987) (en banc)). Likewise, the secondary authority cited by the Court cites to this same, single case. Contrary to the Court's suggestion, the Missouri court did not set aside elementary condemnation principles in favor of issue preclusion. As this Court did in *Heezen*, *Owen* recognized that the condemning authority in that case "appropriated the permanent right, *which is in the nature of an easement*, to invade landowners' property." *Owen*, 741 S.W.2d at 18 (emphasis added). Only then did the court apply claim preclusion to bar a subsequent action for additional elements of compensation that could have been claimed in the initial condemnation proceedings. *See id.* at 18-19.

*Heezen.* *See* 83 S.D. at 207, 157 N.W.2d at 31. This is because in an inverse-condemnation claim, the particulars of the right acquired are found in the facts of the case. As in *Heezen*, Landowners in this case presented documentary and testimonial evidence establishing the current drainage characteristics of Highway 11, the extent of flooding that occurred, and the expected frequency of such flooding. Determining whether future flooding is within the scope of the right acquired by the State in this case is simply a matter of comparing the extent or frequency of the future flooding to that involved in this case and determining whether the State caused such change. The Court's claim-preclusion approach requires essentially the same analysis.

[¶80.] If Landowners were entitled to compensation, I would adhere to this Court's opinion in *Heezen*. As pleaded and argued by Landowners, the State appropriated a property interest by permanently burdening Landowners' properties with recurring, physical invasions of water. Although issue preclusion may also bar Landowners from bringing another claim for compensation in the future, the existence of a second basis for denying future relief to Landowners does not solve the Court's analytical problem of concluding the State took but does not possess Landowners' property. Even if Landowners were entitled to compensation, I would reverse the circuit court on this issue and recognize the State's easement—i.e., the right to use Landowners' properties for the specific, limited purpose of flooding to the extent and frequency proved by Landowners.

> **4. *If Landowners are entitled to compensation, the State's cross-claim should have been presented to the jury.***

[¶81.]     Finally, the State argues the circuit court erred by dismissing the State's cross-claim against the City of Sioux Falls. Likening itself and the City to joint tortfeasors, the State concludes any compensation awarded to Landowners should be offset by the City's liability to Landowners. As the State points out, Landowners' complaint treated the State and City as joint condemnors,[24] but Landowners settled with the City prior to trial. Landowners argue principles of contribution and indemnification only apply in tort actions, not eminent domain. Landowners also argue the circuit court correctly concluded the State failed to prove

---

24.     Landowners filed a single complaint that named the State and City as codefendants, alleging they worked together and were jointly liable for Landowners' loss. Specifically, Landowners alleged:

> 3. The Defendants [(the State and the City)] have changed the natural flow in a manner that results in the flooding of Plaintiffs' property.

> 4. The Defendants in co-operation have increased the volume of the flow of surface waters and speed resulting in the flooding of Plaintiffs' property.

> . . . .

> 14. From 1949 until 2010, the City of Sioux Falls and the State of South Dakota, in conclusion [sic] and jointly, planned for the growth of Sioux Falls and the drainage of surface waters into the natural drainage way of Spring Creek Tributary, which abuts the property of the Plaintiffs.

> . . . .

> 23. The Defendants must be restrained from placing surface waters from Sioux Falls into the natural drainage way . . . .

In light of Landowners' pleadings, the State and the City were codefendants on the issue of liability for Landowners' loss stemming from the July 2010 flooding. Because Landowners settled with the City, the State and City are joint condemners. *Cf. Schick v. Rodenburg*, 397 N.W.2d 464, 468 (S.D. 1986) ("[I]f a plaintiff sues defendants as joint tort-feasors and settles with them, they are joint tort-feasors.").

fault on the part of the City. The Court agrees with Landowners, holding that "the State was not entitled to file a cross-claim against the City seeking contribution under the Joint Tortfeasor's Act." *Supra* ¶ 40.[25]

[¶82.] The Court overlooks the common-law basis for extending tort principles (like those found in the Joint Tortfeasors Act) to an inverse-condemnation claim. As the Court correctly notes, it "is within our purview" to apply common-law principles to inverse condemnation. *Supra* ¶ 40. But under the common law, the total liability of joint condemnors cannot exceed the legal injury actually suffered by a landowner. This Court has long held that compensation "in an eminent domain case [is] not '"manna from heaven"'; [it] must be based on *actual loss of value.*'" *Rupert,* 2013 S.D. 13, ¶ 27, 827 N.W.2d at 66 (emphasis added) (quoting *Lawrence Cty. v. Miller,* 2010 S.D. 60, ¶ 21, 786 N.W.2d 360, 369). As the United States Supreme Court has explained:

> The just compensation required by the constitution to be made to the owner is to be measured by the loss caused to him by the appropriation. He is entitled to receive the value of what he has been deprived of, *and no more.* To award him less would be unjust to him; *to award him more would be unjust to the public.*

*Bauman v. Ross,* 167 U.S. 548, 574, 17 S. Ct. 966, 976, 42 L. Ed. 270 (1897) (emphasis added). By refusing to acknowledge that the compensation Landowners

---

25. The State's cross-claim did not mention the Joint Tortfeasors Act. But it is hardly surprising that the State presents its argument in the form of tort principles. In the complaint, Landowners pleaded inverse condemnation only as an afterthought to their negligence and trespass claims. Landowners' inverse-condemnation claim actually incorporated by reference their pleadings relating to negligence, despite the incompatibility of negligence and inverse-condemnation claims. *See Hyde,* 29 S.D. at 231, 136 N.W. at 96 ("[T]he question of negligence [is] entirely foreign in the law of eminent domain . . . .").

received from the City reduced the State's total liability, the Court in essence holds that Landowners are entitled to receive *more* than the value of what they have been deprived of. The State's invitation to apply the principles embodied in the Joint Tortfeasors Act, however, preserves our common-law rules of compensation.

[¶83.] The Court further holds that "even if the State was entitled to contribution under the common law relating to inverse condemnation, it failed to prove entitlement to that right." *Supra* ¶ 41. But this holding is premised on the erroneous view that it is just for Landowners to receive more than the value of what they have been deprived of. Overcompensating Landowners is no more just than undercompensating them. *Bauman*, 167 U.S. at 574, 17 S. Ct. at 976; *Rupert*, 2013 S.D. 13, ¶ 27, 827 N.W.2d at 66. Therefore, a condemnor's right to an offset requires no more proof than that a joint condemnor partially compensated the person from which property was taken. It is undisputed that Landowners settled with the City. At a minimum, then, the State should have been permitted to present evidence to the jury establishing the amount of that settlement because the State's total liability is necessarily reduced by the same amount.

## Conclusion

[¶84.] Landowners are not entitled to compensation in this case. They did not offer any proof establishing that their loss in 2010 was the natural and probable consequence of the construction of Highway 11 in 1949; therefore, they did not meet their burden of proving proximate causation. If their loss was a natural and probable consequence of the construction of Highway 11, then such was within the

scope of the right acquired by the State to construct the highway. If Landowners are entitled to compensation, then the State necessarily has paid for a drainage easement. Finally, the circuit court's dismissal of the State's cross-claim resulted in overcompensating Landowners. Therefore, I would reverse.


BARNETT, Circuit Judge (dissenting).

[¶85.]        I respectfully join Chief Justice Gilbertson's dissent. He has captured the heart of the problem in his remarks on foreseeability. *Supra* ¶¶ 61-65. Any public improvement undertaken by the state, whether 68 years ago (1949) or in the future, will result in essentially unlimited exposure to claims. This is not what the framers of Article VI, § 13, had in mind.